# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA FOX, | Case No. 1:19-cv-00146-LJO-SAB |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING PLAINTIFF'S SOCIAL SECURITY |
| v. | APPEAL AND REMANDING ACTION FOR |
| COMMISSIONER OF SOCIAL SECURITY, | FURTHER ADMINISTRATIVE PROCEEDINGS |
| Defendant. | (ECF Nos. 27, 28, 29) |
| | OBJECTIONS DUE WITHIN FOURTEEN DAYS |

## I.

## INTRODUCTION

Laura Fox ("Plaintiff" or "Fox"), proceeding in this action through Brittany L. Keenaas as successor in interest,[1] seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act. The matter was referred to a United States magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.

---

[1] On the docket, the successor's last name is spelled as "Keenaas," however, the correct spelling appears to be "Keena." (AR 112.) Additionally, as early as the time of the administrative hearing, Ms. Keena had changed her last name to "Gonzalez." (AR 31.) The Court will refer to the successor as Ms. Keena in this opinion as it appears that is how both parties refer to her in briefing. (ECF Nos. 27 at 7, 28 at 2.)

1

On November 21, 2016, Plaintiff passed away at the age of fifty-three (53) from a post cerebrovascular accident with cerebral edema. (AR 353.) Prior to her passing, Plaintiff suffered from degenerative disc disease of the lumbar spine and amphetamine abuse. For the reasons set forth below, the Court recommends that Plaintiff's Social Security appeal be granted, and that this action be remanded for further administrative proceedings consistent with this findings and recommendations.

## II.

## BACKGROUND

### A.    Procedural History

On April 13, 2015, Plaintiff filed a Title II application for a period of disability and disability insurance benefits. (AR 184-186, 187-193.) Plaintiff alleged disability beginning on March 1, 2015. (AR 187.) Plaintiff's application was initially denied on August 10, 2015, and denied upon reconsideration on September 18, 2015. (AR 81-86, 89-94.) Plaintiff requested and was scheduled to appear for a hearing before Administrative Law Judge Lisa Lunsford (the "ALJ"). (AR 95-96, 97-111.) Plaintiff passed away prior to the scheduled hearing, and Plaintiff's daughter Brittany L. Keena substituted in as a surviving party. (AR 112.) Ms. Keena appeared and testified before the ALJ via videoconference at a hearing conducted on November 27, 2017. (AR 29-59.) On January 10, 2018, the ALJ issued a decision finding Plaintiff was not disabled prior to November 17, 2016, but became disabled on that date with a period of disability continuing until her death on November 21, 2016. (AR 12-28.) On December 4, 2018, the Appeals Council denied Plaintiff's request for review. (AR 1-6.)

Plaintiff filed the instant action with this Court on February 2, 2019. (ECF No. 1.) On October 2, 2019, Plaintiff filed a motion for summary judgment in support of remand. (ECF No. 27.) Defendant filed a brief in opposition on October 23, 2019. (ECF No. 28.) On November 1, 2019, Plaintiff filed a reply brief. (ECF No. 29.)

### B.    Summary of the Medical Evidence and Agency Opinions in the Record

The earliest medical evidence in the record is from Plaintiff's visit to Adventist Health on March 2, 2015, when she presented complaining of tingling from the waist level downward

occurring for one week, stated there was no recent injury, and denied back pain. (AR 330.) Plaintiff complained of weakness in the legs and trouble walking, but reported no neck or back pain, and reported she had never experienced this before. (AR 330.) Plaintiff reported daily use of liquor and tobacco, and had a history of methamphetamine use though she reported stopping for a while, but admitted use the day prior on her birthday. (Id.) Plaintiff reported running out of insurance a few years prior and stated that was when she stopped taking her thyroid medication. (Id.) Current medications included aspirin and tramadol. (AR 331.) The musculoskeletal exam showed antalgic gait, and the neurologic exam showed normal deep tendon reflexes and difficulty with heel and toe walk due to decreased sensation in both lower extremities, though Plaintiff was able to extend the great toes bilaterally. (Id.) Plaintiff was discharged with instructions to go to the hospital for further evaluation and testing. (AR 329.)

Per the discharge instructions, on the same day, March 2, 2015, Plaintiff went to the St. Agnes Hospital complaining of back pain and numbness, tingling, and weakness in the lower legs lasting one week, and a pain score of four (4) in addition to another pain score of three (3) on another assessment. (AR 270-276.) Plaintiff was out of her hypothyroid medication and had not taken the medication for two years. (AR 277, 282.) The nurse practitioner ("NP") wrote "[n]o back pain" under history of illness and under musculoskeletal symptoms, but noted numbness in the bilateral extremities, and Plaintiff's reporting of a floating feeling when standing up. (AR 277.) The musculoskeletal exam showed normal range of motion, normal strength, and found Plaintiff was ambulatory. (AR 278.) The neurological exam found normal steady gait. (Id.) An examination of the back showed no midline tenderness, and 5/5 strength on bilateral upper and lower extremities. (Id.) Plaintiff reported alcohol, tobacco, and amphetamine use. (Id.) Plaintiff was diagnosed with amphetamine abuse, a urinary tract infection, and paresthesia. (AR 280.) Plaintiff was prescribed the pain medication gabapentin, levothyroxine for hypothyroidism, a medication for the infection, as wells as recommended to take aspirin. (Id.)

Plaintiff again visited Adventist Health on March 5, 2015, for follow-up after the hospital visit. (AR 325-26.) Plaintiff informed the NP that she had previously been a patient at the clinic

several years ago but lost her insurance and didn't have money for healthcare; that she had symptoms for two weeks; denied injury; was willing to have x-rays of the lower back as well as physical therapy; was aware she will have labs in eight to ten weeks to evaluate the effectiveness of thyroid medication; and was also aware if her symptoms worsened she would need to be evaluated again in an emergency room. (AR 326.) Current medications were listed as aspirin, gabapentin, levothyroxine, and nitrofurantoin. (AR 327.) Hypothyroid, liver damage, and numbness/tingling in the legs was confirmed. (Id.) A musculoskeletal exam showed normal active range of motion of the lumbar spine, and "NVI to lower extremities" is written.[2] (AR 327.) The treatment plan directed Plaintiff to obtain an x-ray of the lumbar spine, attend physical therapy for evaluation, recheck the thyroid in eight to ten weeks, and follow-up in one month. (Id.)

Two months later, on May 6, 2015, Plaintiff visited Adventist Health with a chief complaint of needing a refill of levothyroxine. (AR 321.) The NP noted Plaintiff had visited two months prior to establish care for paresthesia in the lower extremities, that Plaintiff denied acute injury, denied weakness in the legs, and stated her symptoms persisted or are worsening. (AR 321.) Plaintiff stated she had not had x-rays of the lumbar spine yet but would obtain them after the visit, and stated she had not heard about physical therapy but would call the referral specialist for an update. (AR 321.) Plaintiff stated she had been taking the levothyroxine but ran out of the medication about one month prior. (Id.) Exam notes confirmed hypothyroid, liver damage, and numbness/tingling in both legs. (AR 322.) A musculoskeletal exam showed: decrease range of motion of the lumbar spine; mild lumbar paraspinal muscle tenderness to palpation without obvious deformity, swelling or erythema; pedal pulses intact, strong and equal; and slight decreased sensation to touch. (Id.) The proposed plan was for Plaintiff to obtain a refill of levothyroxine, obtain x-rays, obtain lab tests, check on physical therapy, and to follow-

---

[2] "NVI" is associated with the phrase: "neurovascular intact." See Appendix B. Medical Abbreviations, 3 Cal. Med. Malprac. L. & Prac. Appendix B (2018 ed.) (defining the acronym NVI as neurovascularly intact); Hogan v. Colvin, No. 1:12-CV-1093 MAT, 2015 WL 667906, at *5 (W.D.N.Y. Feb. 17, 2015) (citing medical record utilizing acronym NVI to mean neurovascular intact). However, the term "neurovascular injury" is also utilized in medical terminology, however the Court could not locate any documents clearly associating the term with the acronym NVI. See, e.g., Skeens v. Colvin, No. 14-CV-05754 JRC, 2015 WL 4459342, at *1 (W.D. Wash. July 21, 2015) (utilizing term neurovascular injury).

up in two months or sooner if there were abnormal x-rays. (Id.)

On the same date, May 6, 2015, Plaintiff received an x-ray of the lumbar spine. (AR 309.) Dr. Athate found the x-ray showed normal lumbar lordosis, no substantial scoliosis, normal alignment of the vertebrae, unremarkable soft tissues, along with spondylytic changes seen in the lumbar vertebrae with reduced disc space at L5-S1, and mild retrolisthesis seen in the body of L5 vertebra. (Id.)

On June 10, 2015, Plaintiff visited Adventist Health with a chief complaint of leg numbness and a bruise to the mid-back, and reported pain at a level seven (7) or eight (8). (AR 318.) Plaintiff stated bending, twisting, and lifting made the symptoms worse, while resting, warmth, and medications improved the symptoms. (Id.) Plaintiff exhibited radicular symptoms to the right lower extremity. (Id.) Plaintiff stated she had not heard about physical therapy, and that she took one Norco daily for pain management. (Id.) Exam notes confirmed chronic radicular lower back pain, hypothyroid, liver damage, and numbness and tingling in both legs. (AR 319.) A musculoskeletal exam showed: active range of motion to the upper spine was limited by pain; no obvious deformity, swelling or erythema; confirmed bruising in the mid to lower back; and that the area was tender to palpation. (Id.) Plaintiff was prescribed Norco once a day for pain and was to follow-up in one month for evaluation and thyroid tests. (Id.)

On July 2, 2015, Plaintiff visited Adventist Health with chief complaints noted as refill of Norco pain medication, and a pregnancy test. (AR 310.) Current medications were noted as Norco, levothyroxine, and non-prescription aspirin. (Id.) Exam notes confirmed chronic radicular lower back pain, hypothyroid, liver damage, missed period, and numbness and tingling in both legs. (AR 311.) The musculoskeletal exam showed the active range of motion of the lumbar spine was essentially normal with pain at the end range, with tenderness to palpation of lumbar paraspinal muscles. (AR 311.) Plaintiff's Norco prescription was filled, with zero future refills authorized. (AR 312.)

In August of 2015, state agency physician Deborah Wafer, reviewed Plaintiff's medical records specifically noting the records were limited, appearing to only have the March 2, 2015 treatment records by way of objective medical records. (AR 63-64.) Dr. wafer noted the March

2, 2015 exam record reflected normal exam findings with a discharge diagnosis of acute lower back pain, amphetamine abuse, paresthesia, and urinary tract infection. (AR 63.) Dr. Wafer noted that Plaintiff had not taken hypothyroid medication in two years, and stated "hypothyroidism can cause paresthesias especially when one has not taken medication." (AR 64.) Dr. Wafer opined that Plaintiff "would resolve her impairments if she took medications," and found her allegations partially credible but not supported by the medical record evidence, and the agency denied Plaintiff's application. (AR 64-67, 81-86.)

Plaintiff's request for reconsideration was denied on September 18, 2015. (AR 89-94.) In reviewing Plaintiff's application for reconsideration, the agency considered the following alleged changes in Plaintiff's condition: (1) Plaintiff's indication that her condition changed around June of 2015 when she began experiencing greater difficulty walking and began taking pain medication; and (2) Plaintiff's claim of a new condition beginning in July of 2015 when she was diagnosed with lumbar radiculopathy and had x-rays showing signs of mild retrolisthesis. (AR 69.) State agency physician J. Frankel reviewed the following medical records: (1) the March 2, 2015 visit to the emergency room; (2) the May 6, 2015 office visit and x-ray results; (3) the June 10, 2015 office visit; and (4) the July 2, 2015 office visit. (AR 72.) Given the new records, including the x-ray results, Dr. Frankel found Plaintiff's claims partially credible and found a medium residual functional capacity determination was appropriate. (AR 73.) Dr. Frankel opined that Plaintiff could stand and walk six hours per day, sit six hours per day, lift and carry up to 50 pounds occasionally and 25 pounds frequently, and limited Plaintiff to stooping frequently. (AR 74-75.) The agency denied Plaintiff's application for reconsideration finding Plaintiff not disabled. (AR 76-78, 89-94.)

On November 20, 2015, Plaintiff presented to Clinica Sierra Vista for back care treatment following a change in residence. (AR 482.) On February 1, 2016, Plaintiff followed up for treatment and Plaintiff's doctor increased her Meloxicam dosage and added Gabapentin. (AR 465.) Plaintiff's straight-leg raising test was negative. (Id.) On February 15, 2016, Plaintiff again had a negative straight-leg raising test, and a CT scan was requested. (AR 466-68.) On February 22, 2016, Plaintiff had a follow-up to review lab results and presented with antalgic

gait and was diagnosed with vitamin D deficiency, hypothyroid, lower back pain, and lumbar radiculopathy/paresthesia. (AR 471.)

On March 8, 2016, Plaintiff received a CT scan of the lumbar spine. (AR 439.) The scan showed: (1) mild leftward scoliosis associated with disc desiccation and advanced disc degenerations at T11-12, T12-L1, L1-L2, L2-L3, and L5-S1; (2) mild disc bulges at L3-L4 and L4-L5; (3) no fractures or lytic or blastic metastatic lesions, with anterior osteophytes visible; and (4) unremarkable paravertebral soft tissues. (AR 440.) On March 21, 2016, Plaintiff was referred to an orthopedist for further evaluation and treatment of her lower back pain. (AR 474.)

On June 15, 2016, Plaintiff visited orthopedist Dr. Wahba. (AR 475.) Plaintiff stated she had been experiencing back pain for many years that was slowly getting worse, and that a year and a half prior she had developed numbness and tingling in the bilateral legs. (AR 475-478.) Plaintiff complained that the pain was generally across the entire lower back area, was at a level seven (7), and was constant regardless of position or activity level with nothing making it feel better. (AR 475.) The physical exam showed Plaintiff had steady gait, had normal posture, was able to perform both a heel walk and a tandem walk, had tenderness in the midline spine, had normal range of motion in the hips, had normal 5/5 strength in all areas of the lower extremity motor exam, had normal sensation in her legs apart from decreased sensation that did not correspond to dermatomal patterns, and had pain with deep flexion in the lumbar spine. (AR 477-478.) Plaintiff received x-rays of the lumbar spine which showed a 14-degree scoliosis from L2-L4 apex south 3-4, severe degenerative disc disease at L5-S1, as well as moderate degenerative disc disease at T12-L3. (AR 478.) Dr. Wahba reviewed the March 8, 2016 CT scan which showed multilevel moderate to severe spondylosis with moderate degenerative disc disease at T12-L1, L1-2, and L2-3, as well as severe degenerative disc disease at L5-S1 with foraminal stenosis bilaterally greater on the right than on the left. (AR 478.) Based on the symptoms exhibited with the lower extremities, Dr. Wahba recommended an MRI to determine if there is any focal stenosis, noting "[h]owever, given the diffuse pattern of her complaints I believe it's unlikely that this will end up being a clear spinal ideology [and] [i]f her MRI does not clearly correlate with this atypical pattern it may be valuable to get a formal neurology

consultation as well to evaluate for non-spine related neuropathies or other conditions." (AR 478.)

On June 24, 2016, Plaintiff received an MRI of the lumbar spine. (AR 441.) The MRI showed: (1) degenerative changes most marked at L5-S1, with a mild canal, and severe right and moderate to severe left-sided foraminal stenosis; (2) mild to moderate canal and bilateral foraminal stenosis at L3-L4; (3) mild canal stenosis and mild to moderate bilateral foraminal stenosis at T12-L1, L1-2, L2-3, and L4-5; (4) mild canal stenosis with no compression upon the underlying thoracic spinal cord at T10-11 and T11-12; and (5) an otherwise negative MRI scan of the lumbar spine. (AR 442.)

On November 18, 2016, Plaintiff was admitted to a hospital "complaining of left-sided weakness with a history of substance abuse with positive drug screen for amphetamine and opiates," and was diagnosed with an altered mental status and a cerebrovascular accident. (AR 343, 353.) On November 21, 2016, Plaintiff passed away and was diagnosed on discharge with "[s]tatus post cerebrovascular accident with cerebral edema, status post craniotomy with herniation and hemorrhage," hypothyroidism, and leukocytosis. (Id.)

### C.     The Relevant Hearing Testimony

The daughter of Plaintiff and successor in interest, Ms. Keena,[3] testified at an administrative hearing via video on November 27, 2017. (AR 31.) Counsel Sidney Mickell was present on behalf of Plaintiff. (Id.)

Counsel confirmed there were no outstanding records that he was aware of and confirmed an alleged disability onset date of March 1, 2015. (AR 33.) Counsel then emphasized that while the Plaintiff passed away from a catastrophic cerebrovascular incident, Plaintiff was disabled prior to this incident due to other physical ailments aside from the stroke that caused her to be disabled. (AR 35.) Counsel also argued that Plaintiff's vocational profile would fall within grid rule 201.14, as disabled with a residual functional capacity for sedentary work. (AR 35.) Ms. Keena testified that she recalled Plaintiff mainly working as a cook, at the Trading Post, and then

---

[3]  As discussed above, by the time of the hearing testimony, Ms. Keena had changed her last name to Gonzalez, and was going by the name Brittany Lorraine Gonzalez during the testimony. (AR 31.) However, both parties refer to her as Ms. Keena in briefing, and the Court will do so as well.

South Gate Brewing Company.  (AR 36.)

The ALJ then asked the VE what information he may require to clarify any part of the record.  (AR 36-37.)  The VE stated the descriptions of the jobs showed a lot more preparation, stocking, dishwashing, and other work aside from cooking.  (AR 37.)  The VE found the definition for "kitchen helper" seemed more inclusive of these types of duties.  (Id.)  The VE stated he would like to know if Plaintiff was essentially only a cook, or if the other duties were more frequent than the cooking duties.  (Id.)

Counsel then emphasized the job description included moving 25 to 50 pounds of wood for the pizza oven and heavy cooking pots, and the VE responded such work was more consistent with a kitchen helper position.  (AR 37.)  The ALJ noted other jobs including manager with tasks including stocking, ordering products, customer service, book work, and cleaning the store, along with substantial gainful activity level earnings at a food mart from that time period, and thus the ALJ found three jobs performed as substantial gainful activity.  (AR 38.)  The VE stated he considered the manager position to be a retail manager because Plaintiff supervised other people and the definition permits the manager to perform the actual work in addition to supervising such work.  (AR 38-39.)

Counsel then examined Ms. Keena.  Ms. Keena was not living with Plaintiff in March of 2015, as at that time Plaintiff was living with Ms. Keena's brother's father in Ahwahnee, California.  (AR 39.)  During that time, Ms. Keena had occasional contact with Plaintiff through phone calls, or maybe a visit for a birthday or Christmas.  (Id.)  As of March 1, 2015, the alleged onset date, Ms. Keena recalls Plaintiff frequently complaining about health problems such as back pain, numbness or weakness in the legs, cramping or numbness in the hands, and occasional headaches.  (AR 39-40.)  Ms. Keena recalled that when she was five to ten years old, about fifteen or twenty years prior to the testimony, Plaintiff would have problems with her hands when she would help Ms. Keena with her hair or makeup.  (AR 40.)  At that time, Ms. Keena also recalled Plaintiff had some lower back pain and when Plaintiff would return home from work she would have to sit because of back pain.  (Id.)  Plaintiff was not active other than going to work and would always be tired or in back pain.  (AR 41.)  Ms. Keena also recalled some

complaints about headaches at that time, though the complaints were significantly greater in the last three years prior to the hearing. (Id.) Ms. Keena was not aware of the reason why the complaints increased in the past three years. (Id.) During this more recent period of time, Plaintiff would complain about not wanting to walk the dogs because her legs or head hurt, and wouldn't feel like staying up to watch a movie because of a headache. (Id.)

About a year and a half prior to the hearing, Plaintiff moved closer to Ms. Keena when she moved in with her mother, son, and his family. (AR 41-42.) During this time period, Ms. Keena would usually see Plaintiff at least once a week. (AR 42.) They would not go out but would either sit around the house and watch a movie, or try to play with Plaintiff's grandchild by sitting down and tossing a ball, coloring, or playing computer games. (Id.) During this time, Ms. Keena observed that Plaintiff was always physically limited with everything. (Id.) For example, Plaintiff would need frequent sitting breaks when assisting with cooking. (Id.) Plaintiff would do some quick activities for about twenty minutes and then need to take a break for about twenty or thirty minutes. (AR 43.) This level of limitation was in contrast to how Plaintiff acted when Ms. Keena was a teenager and Plaintiff would do things such as going to Magic Mountain theme park, but stopped doing that five years ago because she could not walk that much and was afraid to go on the rides. (Id.) After moving back in the area Plaintiff did not leave the house much but would occasionally go to a friend's house, however, those visits would involve a lot of sitting and just hanging out, and Plaintiff would get to the friend's house by getting a ride from somebody else. (Id.)

Plaintiff told Ms. Keena that she stopped working because she couldn't stand as long as she needed to at work anymore. (AR 43-44.) At this time, Plaintiff said she would have to lay down and take a nap because her head hurt or couldn't feel her legs, so she couldn't go on walks or be more active with Ms. Keena. (AR 44.) Ms. Keena said Plaintiff would comment on her legs often, and after sitting for a time, if she tried to get up she would have to sit right back down because she couldn't feel her legs. (AR 44.) Plaintiff was wobbly when standing up, would take her time, and brace herself on nearby objects. (Id.) Ms. Keena did not observe Plaintiff using a cane or device to assist in ambulation. (AR 45.) Ms. Keena was not aware of any other issues

affecting Plaintiff other than the pain in the legs, back, hands, and the headaches. (AR 46-47.)

Ms. Keena stated that Plaintiff would sometimes lay in bed napping almost all day, or other parts of the day she would do things like helping Ms. Keena's grandmother in cleaning the bathroom or parts of the house after taking sit breaks, and then she would go take a nap for a couple hours. (AR 45.) Plaintiff would nap all day about twice a week. (Id.) The farthest that Ms. Keena saw Plaintiff walk in the last year of her life was to the mailbox and back, about three houses down. (Id.) Ms. Keena saw Plaintiff occasionally drive during the last year to the store or to a friend's house, only about once a week, as Ms. Keena's grandmother would not give Plaintiff the car too often. (AR 45-46.)

To Ms. Keena's most recent knowledge, Plaintiff was not taking her medication because she could not afford to do so, but prior to then Plaintiff was always regular with taking medication. (AR 46.) Plaintiff could not afford the medication because she didn't have a job after working at South Gate and only had limited money paid by Ms. Keena's grandmother if she helped around the house, which wasn't enough money for medication from what Ms. Keena observed. (Id.)

Ms. Keena believes Plaintiff received her GED and was attempting to go back to college. (AR 47.) Plaintiff wanted to be an alcohol and drug counselor, but that did not work out. (Id.)

The ALJ then began examination of the vocational expert Lawrence Hughes (the "VE"). (AR 47-48.) The VE classified Plaintiff's first two jobs listed as cook, but clarified they really appeared to be a kitchen helper position as discussed previously during the hearing, which is medium work. (AR 48-49.) The other position of retail manager was classified as light work, but heavy as performed according to the records. (AR 49.)

The ALJ first presented a hypothetical person of the same age, education, and work experience as Plaintiff, who was limited to light work but also limited to frequent stooping. (AR 49.) The VE testified that the person would be able to perform the retail manager job as the job is typically classified. (Id.) For a second hypothetical the ALJ reduced the exertional level to sedentary, again with a limitation of frequent stooping, and the VE testified the person would not be able to do Plaintiff's past work. (Id.) As for transferable skills to the sedentary level, the VE

testified that the retail manager position has financial transaction skills and trains other people on the forms of payment.  (AR 49-50.)  The VE noted a sedentary position as check cashier in the check cashing industry was a position that would fit within Plaintiff's skill set.  (AR 50.)  The VE stated this was likely the only sedentary job without more information about Plaintiff's previous level of interaction with customers, however telemarketer was another potential position with Plaintiff's experience as a retail manager.  (AR 50-52.)

The ALJ presented a third hypothetical person who was unable to complete a full workday in any combination of sitting, standing, or walking, and the VE Confirmed the inability to complete an eight-hour workday would preclude all work.  (AR 52.)

Plaintiff's counsel then examined the VE.  (AR 52.)  Counsel inquired about the VE's reliance on the description of Plaintiff's position as retail manager, which did not explicitly mention anything about cashing checks, and the VE conceded it did not.  (AR 53.)  The VE conceded check cashing is becoming less common with more people using debit cards.  (Id.)  The VE stated he did not have knowledge of whether Plaintiff had ever cashed a check in her life in a store, but stated retail managers routinely do so, particularly in the earlier time period of 2004 to 2011.  (Id.)  Counsel asked the VE if Plaintiff's job description specifically discussed whether she trained people, and the VE stated the job description stated she supervised two to three people, called herself a manager, and did customer service, and the VE stated he makes certain assumptions when someone says they are a manager and supervises people in a retail environment.  (AR 53-54.)

Counsel then inquired about the telemarketing position's requirement for inputting information into a computer and asked if the VE was aware of any computer skills that the Plaintiff had.  (AR 54.)  The VE responded that he makes assumptions from her previous positions, such as that she used a cash register, a form of a computer, and that Plaintiff said she did book work and that during the time period in question there would ordinarily be a computer involved.  (Id.)  The VE also stated that computers are involved in every part of life now, and such skills are not a big part of the keyboarding involved in telemarketing.  (AR 55.)  Counsel asked if telephone sales is completely different from standing behind a computer at a retail

setting, and the VE stated it is not that different, particularly if you are a manager in sales. (Id.) The VE stated the SVP for a telemarketer is as low as it gets in the unskilled or semi-skilled job categories, and the Department of Labor now rates telemarketing as unskilled. (Id.)

The fourth hypothetical was in line with the second, but with occasional fingering. (AR 55-56.) The VE stated this would change the analysis in that the check cashier and telemarketing positions require frequent fingering. (AR 56.)

At the end of the hearing, counsel asked Ms. Keena whether Plaintiff ever trained people, and Ms. Keena stated she had never personally seen her train anyone. (Id.) Counsel also made a final statement that he had run telemarketing companies, and while hard to argue against an expert, commonsense says that the requirements of telemarketing including convincing someone to buy something they can't see, versus standing behind a counter waiting for someone to buy an item and hand over money is completely different. (AR 57.) Counsel then stated that as to check cashier, counsel's experience was that if you try and cash a check at such store they would "laugh at you," and there is no evidence that Plaintiff had any of these skills that the VE suggested she may have. (Id.) Counsel also stated 11,000 check cashing jobs in the country is not enough. Further, counsel argued the evidence clearly showed that for about a year and half after stopping work in March of 2015, Plaintiff was having severe problems with her hands and feet, and would be limited to sedentary work, as Ms. Keena testified that Plaintiff required breaks every twenty minutes, couldn't stand and cook longer than twenty minutes, and was essentially in bed all day a couple days a week. (AR 58.) Counsel argued that if Plaintiff was limited to sedentary work she would not have any transferable skills and would not fall within the grid guidelines, and even if she didn't "grid out" with hypothetical three, with even one day off a week or a need for a twenty minute break every twenty minutes, a finding of disabled was required. (AR 58.)

### D.    The ALJ's Findings

The ALJ made the following findings of fact and conclusions of law:

- Plaintiff meets the insured status requirements of the Social Security Act through June 30, 2020.

- Plaintiff had not engaged in substantial gainful activity after the alleged onset date.
- From the alleged onset date of disability, March 1, 2015, until the determined later onset date, November 17, 2016, Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine and amphetamine abuse. Beginning on the established onset date of disability, November 17, 2016, Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine, amphetamine abuse, and catastrophic cerebrovascular accident (CVA) with brain herniation status-post craniectomy.
- Since the alleged onset date of disability, March 1, 2015, Plaintiff has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.
- Prior to November 17, 2016, the date Plaintiff became disabled, Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except Plaintiff was limited to no more than frequent stooping.
- Beginning on November 17, 2016, Plaintiff had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except Plaintiff was unable to complete an 8-hour workday.
- Prior to November 17, 2016, Plaintiff was capable of performing past relevant work as a retail manager. This work did not require the performance of work-related activities precluded by Plaintiff's residual functional capacity.
- Beginning on November 17, 2016, Plaintiff's residual functional capacity has prevented Plaintiff from being able to perform past relevant work.
- Plaintiff was an individual closely approaching advanced age on November 17, 2016, the established disability onset date.
- Plaintiff had at least a high school education and was able to communicate in English.
- Plaintiff did not have work skills that are transferable to other occupations within the residual functional capacity defined above.
- Beginning November 17, 2016 and continuing through the date of her death on

November 21, 2016, considering Plaintiff's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that Plaintiff can perform.

- Plaintiff was not disabled prior to November 17, 2016, but became disabled on that date and continued to be disabled through the date of her death on November 21, 2016.

- Plaintiff's substance use disorder(s) is not a contributing factor material to the determination of disability.

(AR 16-24.)

## III.

## LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five-step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.

Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.

Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.

Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.

Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that

exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

**IV.**

**DISCUSSION AND ANALYSIS**

Plaintiff raises three primary arguments: (A) that the ALJ failed to apply the medical vocational guidelines which find Plaintiff presumptively disabled; (B) that the ALJ failed to develop the record; (C) that the ALJ failed to provide proper weight to the specialists' opinions.

1  (Pl.'s Mot. Summ. J. ("Mot.") 9-14, ECF No. 27; Pl's Reply Br. ("Reply") 4-8, ECF No. 29.)[4]

2      Above, the Court summarized the relevant medical evidence and agency opinions in the

3  record, <u>infra</u> Section II(B).  The Court will now summarize the relevant portions of the ALJ's

4  opinion before turning to Plaintiff's specific arguments.

5      **A.    The ALJ's Opinion**

6      Prior to the catastrophic cerebrovascular accident (CVA") on November 17, 2016, the

7  ALJ found Plaintiff's degenerative disc disease of the lumbar spine and amphetamine abuse

8  qualified as severe impairments, however, found Plaintiff's hypothyroidism was not a severe

9  impairment because it appeared the condition could have been helped medicinally and Plaintiff

10  did not take the medication for more than two years.  (AR 19, 277.)  Further, the ALJ found the

11  condition did not result in any functional limitations or secondary symptoms, and the state

12  agency physicians found the condition non-severe.  (AR 19, 73.)

13      The ALJ evaluated the statements provided by the substituted party, Plaintiff's daughter

14  Ms. Keena, concerning Plaintiff's complaints of lower back pain, numbness, weakness in the

15  legs, hand cramps, and occasional headaches, as well as the claim that Plaintiff had stopped

16  working because she could no longer stand for long periods.  (AR 20.)  The ALJ found the

17  witness statements about the Plaintiff's symptoms were inconsistent with the objective medical

18  evidence and medical opinions.  (AR 20.)  The ALJ stated there was no treating source medical

19  opinion that supported greater functional restrictions prior to November 17, 2016.  (<u>Id.</u>)

20      The ALJ acknowledged the limited treatment evidence in the record prior to the CVA in

21  November of 2016.  (<u>Id.</u>)  The ALJ evaluated the March 2015 records reflecting Plaintiff's

22  hospital visit for low back pain, amphetamine abuse, and paresthesia in the lower extremities,

23  finding it significant that the treatment notes showed the lower extremity numbness was

24  intermittent, for just one week, and that Plaintiff reported no lower back injury.  (AR 20, 270,

25  276.)  The ALJ noted that while Plaintiff was prescribed gabapentin, there was no treatment

26  evidence to show whether it had an effect on her symptoms, Plaintiff reported a pain score of 4,

---

27  [4]  All references herein to pagination of electronically filed documents pertain to those as indicated on the upper
right corners via the CM/ECF electronic court docketing system.

28

and was discharged with a diagnosis of lower back pain in stable condition. (AR 20, 271, 275-76.)

The ALJ reviewed the May 2015 lumbar x-ray and acknowledged it revealed spondylytic changes with reduced disc space at the L5-S1 and mild retrolisthesis seen in the L5 vertebra. (AR 20, 309-311.) The ALJ noted Plaintiff was then prescribed Norco and that a lumbar exam revealed Plaintiff's active range of motion was essentially normal with pain at the end range. (Id.)

The ALJ reviewed the March 8, 2016 CT scan of the lumbar spine and acknowledged that it revealed mild scoliosis associated with disc desiccation and degeneration, and mild disc bulges at the L3-4 and L4-5 levels. (AR 20-21, 440.)[5]

The ALJ reviewed the June 24, 2016 MRI of the lumbar spine acknowledging that it showed mild to moderate degenerative disc disease with mild to severe stenosis but no compression on the underlying spinal cord. (AR 21, 442.)

The ALJ then again emphasized that "[t]here [was] minimal treatment evidence prior to the established onset date." (AR 21.) The ALJ stated Plaintiff "was seen on an intermittent basis at Clinica Sierra Vista primarily for complaints of back pain that were treated conservatively with medication only." (AR 21, 446-511.) The ALJ: (1) stated there was no clear evidence of past physical therapy or pain management treatment; (2) considered Plaintiff presented with negative straight-leg raising testing on February 1 and 15, 2016 (AR 465-66); and (3) noted an "evaluating orthopedist indicated an essentially normal musculoskeletal examination despite the claimant's subjective allegations . . . but found no clear spinal explanation" for the complaints (AR 475, 477-78). (AR 21.)[6]

---

[5] While the ALJ's summary stated the scoliosis was associated with disc degeneration, the report stated it was related to advanced disc degenerations at T11-12, T12-L1, L1-L2, L2-L3, and L5-S1 levels. (AR 440.)

[6] As summarized above, on June 15, 2016, Plaintiff presented with steady gait, had normal posture, was able to perform both a heel walk and a tandem walk, had tenderness in the midline spine, had normal range of motion in the hips, normal 5/5 strength, and normal sensation in her legs apart from decreased sensation that did not correspond to dermatomal patterns, and had pain with deep flexion in the lumbar spine. (AR 477-478.) Based on the symptoms exhibited with the lower extremities, Dr. Wahba recommended an MRI to determine if there is any focal stenosis, noting "[h]owever, given the diffuse pattern of her complaints I believe it's unlikely that this will end up being a clear spinal ideology [and] [i]f her MRI does not clearly correlate with this atypical pattern it may be valuable to get

Based on the above evidence, the ALJ concluded that while the Plaintiff's impairments could reasonably be expected to cause the alleged symptoms, the statements concerning the intensity, persistence and limiting effects were not supported prior to November 17, 2016. (AR 21.) The ALJ specifically stated that "[o]f great significance, there is no medical opinion consistent with the claimant's allegation of disability or which supports any greater restrictions than those determined herein." (AR 21.) Turning to the opinion evidence, the ALJ gave partial weight to the non-examining state agency sources "in light of a lack of treating or examining source functional assessment [AR 68-77]," giving "great weight to their assessment, except with regard to the exertional level, which is reduced from medium to light to better account for the claimant's pain and other subjective symptoms." (AR 21.)

The ALJ found that prior to the CVA, the evidence of record did not support the witness's testimony that Plaintiff was limited to no more than sedentary work. (AR 21.) Here, the ALJ again relied on the June 15, 2016 orthopedist's exam findings (AR 477-78), also noting that overall Plaintiff only "sought treatment on an intermittent basis for complaints of back pain that were treated conservatively with medication only," that Plaintiff had a pain score of only four (4) (AR 275), and negative straight-leg-raising tests (AR 465-66). (AR 22.)

### B.    Application of the Medical Vocational Guidelines

Plaintiff argues that under the medical vocational guidelines, Fox was presumptively disabled if she could not perform light work as she was approaching advanced age and had minimal education. (Mot. 10.) In support of this argument, Plaintiff highlights that: (1) in her application Plaintiff wrote she could not work because of weakness, numbness in the legs, unsteadiness, pain from prolonged standing, and swelling in the feet and ankles and lower back (AR 219); (2) Ms. Keena's testimony showed Plaintiff could not stand without taking breaks every twenty minutes and was in pain (AR 57); (3) Orthopedist Dr. Wahba found Plaintiff had an antalgic gait and difficulty with the heel to toe walk due to decreased sensation in the lower extremities (AR 331); (4) Dr. Wahba analyzed four x-rays of Fox's spine and referred her for

---

a formal neurology consultation as well to evaluate for non-spine related neuropathies or other conditions." (AR 478.)

further work up due to lower body numbness (AR 479); and (5) subsequent CT scans showed multilevel moderate to severe spondylosis with moderate degenerative disc disease (AR 478). (Mot. 10-11.)  In sum, Plaintiff argues she could not stand or walk six hours a day because of bulging discs which rested on the spine with associated pain, and because of such, body numbness and pain prevented Plaintiff from being able to stand for six hours a day.  (Mot. 11.)

In briefing, Defendant states that Plaintiff's briefing is unclear.  Defendant does not directly respond to Plaintiff's argument concerning the medical vocational guidelines, and instead views Plaintiff's arguments as a collective challenge to the ALJ's evaluation of the medical and opinion evidence, in addition to arguing that the ALJ had a duty to further develop the record.  (Def.'s Opp'n Pl.'s Opening Br. ("Opp'n") 5-7, ECF No. 28; Mot. 9-14.)  The Court agrees with Defendant that Plaintiff's briefing is unclear in this regard, and the Court views Plaintiff's argument as essentially a challenge to the ALJ's evaluation of the evidence of record and the RFC determination.  The Court will nonetheless briefly address Plaintiff's argument that the ALJ failed to properly apply the medical vocational guidelines.

The Social Security Administration created the Medical-Vocational Guidelines (the "grids") to assist in the step-five determination.  Hoopai v. Astrue, 499 F.3d 1071, 1075 (9th Cir. 2007).  The grids "consist of a matrix of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy."  Heckler v. Campbell, 461 U.S. 458, 461–62 (1983).  "Where a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion as to whether work exists that the claimant could perform, [and] [i]f such work exists, the claimant is not considered disabled."  Id. at 462.  For each combination of the four factors, the grids "direct a finding of either 'disabled' or 'not disabled' based on the number of jobs in the national economy in that category of physical-exertional requirements."  Lounsbury v. Barnhart, 468 F.3d 1111, 1115 (9th Cir. 2006).  "If a claimant is found able to work jobs that exist in significant numbers, the claimant is generally considered not disabled."  Id.

Social Security Rulings ("SSR(s)") "do not carry the 'force of law,' " however, "they are

20

binding on ALJs," and "reflect the official interpretation of the [SSA] and are entitled to some deference as long as they are consistent with the Social Security Act and regulations." Molina v. Astrue, 674 F.3d 1104, 1114 n.5 (9th Cir. 2012) (citations omitted). Plaintiff is correct that SSR 83-10 states that "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." Soc. Sec. Ruling 83–10. However, Plaintiff only conclusively argues: "Fox could not stand for 6 hours a day and could not meet the requirement for light work . . . the ALJ did not explain how Fox could stand for six hours a day five days a week," and "[t]herefore, the ALJ did not use the Medical Vocational Profiles accurately." (Reply 6.) In this regard, Plaintiff appears to make an argumentative leap by contending that Plaintiff could not perform light work due to not being able to stand or walk for more than six hours.

The ALJ's RFC determination limited Plaintiff to light work, but limited Plaintiff to no more than frequent stooping. (AR 19.) The Court notes that SSR 83-10, which Plaintiff relies on, does not explicitly restrict light work to occasional stooping, however does acknowledge that most light positions do not require frequent stooping, as it states that: "[t]he lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping." Soc. Sec. Ruling 83–10. There is no medical opinion in the record restricting Plaintiff to less than six hours of standing or walking a day, and the ALJ was permitted to weigh the clinical findings and medical evidence in the record in making an RFC determination as "the ALJ is responsible for translating and incorporating clinical findings into a succinct RFC." Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015). Plaintiff was a person closely approaching advanced age, was a high school graduate, and was able to communicate in English. (AR 23, 47.) Therefore, even with an RFC limiting her to light work, and no transferable skills, Plaintiff would not be presumptively disabled under the Medical-Vocational Guidelines. See 20 C.F.R. § Pt. 404, Subpt. P, App. 2.

Thus, the Court finds the ALJ did not err by declining to find Plaintiff presumptively disabled under the medical vocational guidelines, as Plaintiff seems to be arguing. The ALJ was not required to find Plaintiff restricted to less than six hours of walking or standing in an eight-

hour workday based on the evidence in the record, and therefore was not required to find Plaintiff disabled under the grids. Nonetheless, as explained below, the ALJ did err in failing to have a medical expert provide an opinion or testify concerning objective medical imaging results that were never addressed by a medical expert or physician.

### C. Development of the Administrative Record and Weight Given to Physician Opinions

Next, Plaintiff argues that the ALJ failed to properly develop the administrative record, and when she gave full weight to the non-examining doctors' decisions, she committed factual error. (Mot. 11-14.) Plaintiff highlights the ALJ's acknowledgment that there was minimal evidence in the record and the fact the ALJ gave the non-examining state agency sources great weight. Again, Plaintiff's arguments in briefing are somewhat unclear and her brief section V(B), entitled "the ALJ failed to develop the record," and brief section V(C), entitled "the ALJ failed to provide proper weight top Fox's specialists," appear to overlap in many regards. Therefore, the Court shall address both arguments collectively here. For the reasons explained below, the Court finds the ALJ erred in failing to utilize a medical expert or state agency physician to opine on the interpretation of objective medical imaging results that no physician or expert provided an opinion regarding in relation to Plaintiff's limitations.

The claimant generally has the duty to provide the agency with evidence proving that they are disabled. See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under disability unless he furnishes such medical and other evidence of the existence thereof"). In making a determination, the agency "shall consider all evidence available in such individual's case record . . . shall develop a complete medical history of at least the preceding twelve months," and "shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make such determination, prior to evaluating medical evidence obtained from any other source on a consultative basis." 42 U.S.C. § 423(c)(5)(B).

The ALJ has "a special duty to fully and fairly develop the record and to assure that the

claimant's interests are considered." Widmark v. Barnhart, 454 F.3d 1063, 1068 (9th Cir. 2006) (quoting Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983)). The ALJ must be especially diligent when the claimant is unrepresented. Widmark, 454 F.3d at 1068; McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011). The "ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." Mayes, 276 F.3d 453 at 459-60 (citing Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001)). A specific finding of ambiguity or inadequacy in the record is not required to trigger the necessity to further develop the record where the record itself establishes the ambiguity or inadequacy. McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011).

Plaintiff argues the ALJ based her findings on the non-examining state physician opinions sources which Plaintiff states were based solely on the records from Saint Agnes Medical Center where Fox was seen for one day in urgent care for leg numbness on March 2, 2015 (AR 81), and the ALJ gives no other source weight. (Mot. 12.) Plaintiff highlights that Plaintiff wrote in the disability application that her treating doctors were Dr. Ewing and Dr. Gerwahl (AR 256), yet Plaintiff contends those records are not in the administrative record. (Mot. 12.) Plaintiff also emphasizes a record from Dr. Wahba who found antalgic gait and difficulty with the heel to toe walk due to decreased sensation in the lower extremities with a referral to neurology for further analysis (AR 331, 475). (Mot. 12-13.) Plaintiff argues Dr. Wahba's treatment was not addressed. (Mot. 14.) Plaintiff further argues that the ALJ has the power to subpoena Plaintiff's doctors, or obtain consultation from a medical expert, but the ALJ did not obtain any medical consultation, and as such, argues the ALJ's findings are independent medical findings that are not supported by medical evidence, were made using a sparse record that did not include the medical records leading up until Plaintiff's death, and are thus not supported by substantial evidence. (Mot. 12-14.)

As to these specific arguments put forth from Plaintiff, the Court finds the briefing is inaccurate in multiple regards where Plaintiff states certain records were unavailable to the state agency physicians or in her argument that the ALJ wholly failed to address certain aspects of the medical evidence. Plaintiff's argument that records from treating doctors Dr. Ewing and Dr.

Gerwahl were not in the administrative record (Mot. 12), is not accurate. Plaintiff reported the following records from Dr. Ewing and Gerwahl in her disability application: (1) November 20, 2015; (2) February 1, 2016; (3) February 15, 2016; (4) February 22, 2016; and (5) March 21, 2016. (AR 256.) These records all appear in the administrative record as described in the Court's summary of the medical evidence above, infra Section II(B). (AR 465, 466, 471, 474, 482.) Additionally, the ALJ explicitly referenced the records dated February 1 and 15, 2016, in her opinion. (AR 21.)

Plaintiff's argument that the ALJ failed to address Dr. Wahba's opinion (Mot. 14), is also inaccurate. The ALJ specifically stated that "[a]n evaluating orthopedist indicated an essentially normal musculoskeletal examination despite the claimant's subjective allegations [AR 475, 477], but found no clear spinal explanation for the claimant's complaints [AR 478]." (AR 21.) The evaluating orthopedist referred to by the ALJ here is in fact Dr. Wahba, and thus Plaintiff again misstates the record in this regard.

Plaintiff's argument that the non-examining consultants did not have access to the entire record and only used one medical source from the emergency visit to St. Agnes is only partially accurate. The initial review of Plaintiff's application occurred in August of 2015, and it appears that Dr. Wafer only reviewed the March 2, 2015 treatment records in making the disability determination, with Dr. Wafer specifically opining the records were limited. (AR 63-64.) Thus, on the date of the initial review by Dr. Wafer, Dr. Wafer did not review the following records: (1) the follow-up visit to Adventist on March 5, 2015 (AR 325-27); (2) the visit to Adventist on May 6, 2015 for a refill of medication (AR 321-22); (3) the May 6, 2015 x-ray of the lumbar spine (AR 309); (4) the clinic visit on June 10, 2015 when she was prescribed Norco; and (5) the July 2, 2015 visit to Adventist (AR 310-319).

However, as for Plaintiff's application for reconsideration which was denied on September 18, 2015, in addition to the March 2, 2015 records, Dr. Frankel also reviewed the May 6, 2015 records including the x-ray results, the June 10, 2015 record, and the July 2, 2015 records. (AR 71-72.) Therefore, upon reconsideration review, the state agency physician reviewed essentially all the records available at the time, and the March 5, 2015 record did not

reflect any significant findings differing from the other records reviewed.[7]

The Court does not find the ALJ erred in failing to develop the record insofar as Plaintiff's argument that the ALJ was required to obtain additional medical records from Plaintiff's previous treatment, as it appears the sparseness of medical records was due to Plaintiff's own gaps in seeking treatment, and Plaintiff's arguments that certain records were not in the record or were never considered by the ALJ is inaccurate. Further, at the administrative hearing, Plaintiff was represented by counsel, and counsel confirmed there were no outstanding records that he was aware of. (AR 33.)

Nonetheless, the Court finds the ALJ erred in her RFC determination as there were objective medical testing imaging results in the record that were not analyzed by any doctor or medical expert, and no opinion as to how those medical imaging results would impact Plaintiff's ultimate RFC or limitations generally. Following the state agency's reconsideration review on September 18, 2015 (AR 71-72), Plaintiff received a CT scan on March 8, 2016, which showed advanced disc degenerations at T11-12, T12-L1, L1-L2, L2-L3, and L5-S1. (AR 474.) On June 15, 2016, Dr. Wahba opined that the CT scan showed multilevel moderate to severe spondylosis with moderate degenerative disc disease at T12-L1, L1-2, and L2-3, as well as severe degenerative disc disease at L5-S1 with foraminal stenosis bilaterally greater on the right than on the left. (AR 478.) Dr. Wahba recommended an MRI to determine if there was any focal stenosis. (Id.) The subsequent June 24, 2016 MRI showed: (1) degenerative changes most marked at L5-S1, with a mild canal, and severe right and moderate to severe left-sided foraminal stenosis; (2) mild canal stenosis and mild to moderate bilateral foraminal stenosis at T12-L1, L1-2, L2-3, and L4-5; and (3) mild canal stenosis with no compression upon the underlying thoracic spinal cord at T10-11 and T11-12. (AR 442.)

The ALJ only passingly refers to the objective medical imaging results in her opinion. In reviewing the March 8, 2016 CT scan, the ALJ acknowledged it showed disc degeneration, however did not restate that it showed "advanced" disc degeneration. (AR 20-21.) In her review

---

[7] The March 5, 2015 visit was for a follow-up after the March 2, 2015 hospital visit, showed a normal musculoskeletal exam, and recommended Plaintiff for x-rays, a physical therapy follow-up, and a thyroid recheck.

of the June 2016 MRI, the ALJ acknowledged that it showed mild to moderate degenerative disc disease and mild to severe stenosis, but the ALJ's only explanation of this record is that it showed no compression of the underlying spinal cord. (AR 21.) The ALJ did not explain the impact of the 2016 MRI results showing mild to severe stenosis despite Dr. Wahba's explicit recommendation to obtain an MRI to determine the presence of stenosis. (AR 21, 478.)

The ALJ stated that "[o]f great significance, there is no medical opinion consistent with the claimant's allegation of disability or which supports any greater restrictions than those determined herein." (AR 21.) The ALJ then gave partial weight to the non-examining state agency sources "in light of a lack of treating or examining source functional assessment [AR 68-77]," but then gave "great weight to their assessment, except with regard to the exertional level, which is reduced from medium to light to better account for the claimant's pain and other subjective symptoms." (AR 21.)

The Court is unable to determine how the ALJ arrived at the conclusion that Plaintiff was capable of light work. Further, there is no medical opinion opining on how the most recent medical imaging would impact Plaintiff's ultimate RFC. Absent adequate explanation of the record, without specific support from a medical source, and with no testimony from a medical expert, the ALJ appears to have defined her own limitations for Plaintiff. The Court finds that this was error. See Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (the ALJ was not qualified as a medical expert and therefore could not permissibly go outside the record to consult medical textbooks for purpose of making his own assessment of the claimant's physical condition); Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) ("As a lay person, ... the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the determination."); Hoskins v. Comm'r of Soc. Sec., No. 117CV01520LJOSAB, 2019 WL 423128, at *14 (E.D. Cal. Feb. 4, 2019) (finding that because an exam record and two most recent MRIs were not reviewed by the state agency physicians, and there was no state medical opinion addressing Plaintiff's residual functional capacity incorporating these records, it was error to give great weight to the state agency physicians' RFC determinations when they did not have access to these most recent records), report and recommendation adopted, No.

117CV01520LJOSAB, 2019 WL 1004573 (E.D. Cal. Feb. 28, 2019); Daniel Garcia v. Comm'r of Soc. Sec., No. 1:18-CV-00914-SAB, 2019 WL 3283171, at *7 (E.D. Cal. July 22, 2019) (holding the ALJ erred in assigning great weight to the non-examining state expert opinion as although the cervical MRI was considered by the ALJ, the MRI was not reviewed by the state agency physician, and thus, there was no state medical opinion addressing Plaintiff's residual functional capacity that considers the cervical MRI); Samoy v. Saul, No. 2:18-CV-538-EFB, 2019 WL 4688638, at *4 (E.D. Cal. Sept. 26, 2019) (holding the ALJ's RFC determination was not supported by substantial evidence because recent "MRI results were not reviewed by the two physicians who provided opinions regarding plaintiff's functional limitations," and yet "the ALJ concluded, based on his review, that the MRI results were consistent with" limitations on reaching, and the ALJ was not a medical expert and thus not qualified to interpret raw medical data in functional terms, and thus "the ALJ was required to retain a medical expert to evaluate this evidence."); see also Tonapetyan, 242 F.3d at 1150-51 (ALJ erred in not developing record and by relying on testimony of physician who indicated more information was needed to make diagnosis and recommended a more detailed report be obtained); Hilliard v. Barnhart, 442 F.Supp.2d 813, 818-19 (N.D. Cal. 2006) (ALJ erred by failing to develop record where he relied on the opinion of a physician who recognized he did not have sufficient information to make a diagnosis).

### D.     Remand

The ordinary remand rule provides that when "the record before the agency does not support the agency action, . . . the agency has not considered all relevant factors, or . . . the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1099 (9th Cir. 2014). This applies equally in Social Security cases. Treichler, 775 F.3d at 1099. Under the Social Security Act "courts are empowered to affirm, modify, or reverse a decision by the Commissioner 'with or without remanding the cause for a rehearing.' " Garrison, 759 F.3d at 1019 (quoting 42 U.S.C. § 405(g)). The decision to remand for benefits is

discretionary. <u>Treichler</u>, 775 F.3d at 1100. In Social Security cases, courts generally remand with instructions to calculate and award benefits when it is clear from the record that the claimant is entitled to benefits. <u>Garrison</u>, 759 F.3d at 1019.

The Ninth Circuit has "devised a three-part credit-as-true standard, each part of which must be satisfied in order for a court to remand to an ALJ with instructions to calculate and award benefits: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." <u>Garrison</u>, 759 F.3d at 1020. The credit as true doctrine allows "flexibility" which "is properly understood as requiring courts to remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled. <u>Id.</u> at 1021. Even when the circumstances are present to remand for benefits, "[t]he decision whether to remand a case for additional evidence or simply to award benefits is in our discretion." <u>Treichler</u>, 775 F.3d at 1102 (quoting <u>Swenson v. Sullivan</u>, 876 F.2d 683, 689 (9th Cir. 1989)).

Here, further administrative proceedings are warranted as the record raises a serious doubt that Plaintiff is in fact disabled. The Court recommends that this action be remanded for further administrative proceedings consistent with this findings and recommendations.

## V.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, the Court finds that the ALJ erred in assigning great weight to the state agency physician opinions and by failing to obtain expert review of recent objective medical imaging by a medical expert or physician. Therefore, substantial evidence does not support the residual functional capacity determination and this action should be remanded for further administrative proceedings.

Accordingly, IT IS HEREBY RECOMMENDED that Plaintiff's appeal from the decision of the Commissioner of Social Security be GRANTED and this matter be remanded

back to the Commissioner of Social Security for further proceedings consistent with this findings and recommendations.

This findings and recommendations is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304. Within **fourteen (14) days** of service of this recommendation, any party may file written objections to this findings and recommendations with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **December 10, 2019**

UNITED STATES MAGISTRATE JUDGE